## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| FEMI BOGLE-ASSEGAI, | : CIVIL ACTION NO. 3:02CV2292 (JCH) |
|     Plaintiff, | : |
| | : |
|     VS. | : |
| | : |
| STATE OF CONNECTICUT, | : |
| COMMISSION ON HUMAN RIGHTS | : |
| AND OPPORTUNITIES; and | : |
| CYNTHIA WATTS ELDER, in her | : |
| official capacity as Executive Director, | : |
| Connecticut Commission on Human Rights | : |
| and Opportunities, ("CHRO") and | : |
| LEANNE APPLETON, in her individual | : |
| capacity and official capacity as | : |
| Director of Finance of CHRO; and | : |
| DONALD NEWTON, in his individual | : |
| capacity and official capacity as | : |
| CHRO Chief of Field Operations, | : SEPTEMBER 16, 2004 |
|     Defendants | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This is a case filed by a former employee of the Commission on Human Rights

and Opportunities (hereinafter "CHRO") who was terminated in 2001 for misconduct.

She filed this action against the CHRO and individual defendants Cynthia Watts Elder,

the former Executive Director of the CHRO ( in her official capacity only), Donald

Newton, the current CHRO Chief of Field Operations (official and individual capacities)

–1–

and Leanne Appleton, the former CHRO Business Manager (official and individual capacities).

Although it is somewhat vague, the defendants interpret the plaintiff's complaint to raise the following claims: (1) disparate treatment discrimination and retaliation under Title VII and the Connecticut Fair Employment Practices Act ("CFEPA") based on race, religion, color, and national origin; (2) an equal protection claim against defendants Newton and Appleton under 42 U.S.C. §§ 1983, 1981 and the U.S. and Connecticut Constitutions; (3) a hostile work environment claim under Title VII; (4) a retaliation claim against the CHRO, Watts Elder, Newton and Appleton under Equal Protection, Title VII, §§ 1983 and 1981; and (5) a claim under C.G.S. § 46a-99.  The defendants submit that this summary judgment motion will dispose of the entire case.

## II.  **BACKGROUND**

The defendants rely upon their Rule 56(a)(1) Statement of Facts and for the sake of space will not reiterate all of the facts. However, the defendants will remind the court of some crucial facts pertinent to the central legal issue in this case.

Early in 2001, while she was employed by the Commission on Human Rights and Opportunities (hereinafter "CHRO" or "Commission") as the Regional Manager in the Waterbury office, the plaintiff was caught falsifying her time records and stealing pay from the taxpayers of this state. Another CHRO employee under plaintiff's supervision

allegedly was also doing the same. (Facts ¶¶ 58-72). As required by law, CHRO

Executive Director Cynthia Watts Elder (hereinafter "Watts Elder") scheduled a

Loudermill hearing and appointed plaintiff's supervisor, Donald Newton (Chief of Field

Operations for CHRO – hereinafter "Newton") to serve as Hearing Officer. (Facts ¶¶ 76-

79).

On March 12, 2001, Newton presented plaintiff with the computer records for the

Rowland Government Building inn Waterbury juxtaposed against the time sheets records

which had been submitted and signed by plaintiff. He asked her to explain the hours of

unaccounted for time that the plaintiff recorded on his time sheet. (Facts ¶ 79). At that

first hearing, the plaintiff counsel informed Newton that an injunction proceeding had

been initiated in state court and demanded that the proceeding be stopped. No injunction

having been issued from a court, the meeting proceeded. The plaintiff requested and was

given additional time, until March 18, 2001 in which to file a written response. (Facts, ¶

79). Instead of responding to the issue of her falsified time records, on March 14, 2001,

plaintiff's counsel wrote a letter to the Executive Director making numerous vague

collateral attacks. (Facts ¶ 89).

Over two weeks passed without a response from the plaintiff to the issue of her

time sheets. Despite testimony from the plaintiff that she and her attorney compiled

records that would allegedly show prove that she was at work on the numerous days that

the records indicated she was not, no documents were ever produced to the Executive

Director for her consideration. (Facts, ¶'s 80-81).

On March 26 2001, a second Loudermill hearing was held expanding the issues to

include the accuracy of time records for another CHRO that the plaintiff had approved

and to give her yet another opportunity to explain the discrepancies in her time sheets.

At the second <u>Loudermill</u> hearing on March 26, 2001, the plaintiff and her counsel

appeared, but again failed to produce any evidence to explain or refute the charges.

(Facts ¶ 91).  Instead, they simply stated their belief that the CHRO investigation of

plaintiff's time records was "bogus".  Newton passed this information along to Watts

Elder, who was the only person who had the authority to make a decision concerning

termination. (Facts ¶ 91-92).  Again, at the March 26, 2001 Loudermill hearing,

plaintiff's counsel tried to intimidate Newton by telling him he should put his property in

his wife's name, and by asserting that the CHRO had no right to take any action against

plaintiff while the injunction  action was pending, even though plaintiff's counsel

admitted that the court had NOT issued the restraining order or the injunctive relief

which was sought. (Facts ¶¶ 89, 91, 119, 120).

Faced with <u>no</u> evidence whatsoever from the plaintiff to explain or refute these

very serious charges, and mindful that the state court had <u>not</u> issued any injunction, Watts

Elder (herself a black female just like the plaintiff) felt that she had no choice but to act

on the matter.  She made the decision to terminate the plaintiff and by letter dated March 29, 2001, so informed Bogle-Assegai that her employment would end effective April 12, 2001. (Facts ¶ 92).

It is very important to note that this plaintiff never attempted to defend this case on the merits before she was fired.  (Facts ¶¶ 79-81, 89-92).  Instead, she launched every conceivable collateral attack she could think of against the defendants, especially Cynthia Watts Elder.  (Facts ¶¶ 89, 91).  For example, the plaintiff managed to get the "Connecticut Caucus of Black Women" (a small group of minority women in the Hartford area) to issue a proclamation denouncing Watts Elder's leadership of CHRO, and particularly alleging a "witch hunt" of plaintiff.  (Facts ¶ 91).

On April 9, 2001, the plaintiff filed for an injunction in federal court attempting to block her termination. A hearing was held on April 10, 2001 and the request for temporary relief was denied. (Facts, ¶ 120).  The plaintiff elected not to appeal Watts Elder's decision to fire her through Conn. Gen. Stat. § 5-202 and § 4-183. Instead, the plaintiff's EEOC complaint then followed, which was filed 187 days later on October 1, 2001.  (Facts ¶ 121).

### III.     STANDARD OF REVIEW

A motion for summary judgment is granted when there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter

of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The burden is on the moving

party to demonstrate the absence of any material factual issue genuinely in dispute.

American Int'l Group, Inc. v. London American Int'l Corp., 664 F.2d 348, 351 (2d Cir.

1981).  In determining whether a genuine factual issue exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Nonetheless, "the statutory purposes of

summary judgment – avoiding protracted, expensive and harassing trials – apply no less

to discrimination cases than to commercial or other areas of litigation."  Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir.) cert. denied, 474 U.S. 829 (1985).

This is not to say that de minim is evidence is sufficient to overcome summary

judgment.  Speaking to this issue in Reeves v. Sanderson Plumbing Products, Inc., 530

U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the United States Supreme Court

stated:

> Certainly there will be instances where, although the plaintiff has
> established a prima facie case and set forth sufficient evidence to reject the
> defendant 's explanation, not rational fact finder could conclude that the
> action was discriminatory.  **For instance, an employer would be entitled
> to judgment as a matter of law if the record conclusively revealed some
> other, nondiscriminatory reason for the employer's decision, or if the
> plaintiff created only a weak issue of fact as to whether the employer's
> reason was untrue and there was abundant and uncontroverted
> independent evidence that no discrimination had occurred.**

Id. at 148. (emphasis added).

IV.    **ARGUMENTS**

A.    **THE CLAIMS AGAINST DONALD NEWTON AND LEANNE APPLETON IN THEIR INDIVDIUAL CAPACITIES MUST BE DISMISSED FOR LACK OF SERVICE OF PROCESS**.

Defendants Newton and Appleton contest personal jurisdiction under Rule 12(b)(5) for the lack of proper service of process. The summons and complaint were not served on them. The Second Circuit has held that a motion to dismiss for lack of personal jurisdiction must be granted if the plaintiff fails to serve a copy of the summons and complaint upon the defendants. Schaeffer v. Village of Ossining, 58 F.3d 48, 49-50 (2d Cir. 1995). Federal Rule 4(e) provides that service upon an individual may be made by in-hand service, abode service, by request to waive, or pursuant to the law of the state in which the district is located. See, Fed. R. Civ. P. 4(e) and (f). In Connecticut, service may be made on an individual by in-hand service or abode service. Conn. Gen. Stat. § 52-57(a).

In the present case, the return of service filed by the marshal in this case indicates that service was effectuated against defendants CHRO, Watts Elder, Appleton and Newton **"officially"** by leaving with the Office of the Attorney General, no doubt because these defendants were also sued in their official capacities to actual return read:

THEN and by virtue hereof and by direction of the plaintiff's Attorney, I made due and legal service of the within original Writ, Summons and Complaint by leaving a true and attested copy with and in the hands of Gregory D'Auria, Associate Attorney General for the State of Connecticut, whom is duly authorized to accept service on behalf of the within named defendant:

**DONALD NEWTON (in his official capacity)**

–7–

THEN and by virtue hereof and by direction of the plaintiff's Attorney, I made due and legal service of the within original Writ, Summons and Complaint by leaving a true and attested copy with and in the hands of Gregory D'Auria, Associate Attorney General for the State of Connecticut, whom is duly authorized to accept service on behalf of the within named defendant:

**LEANNE APPLETON (in his official capacity)**

(Doc. Entry #5; Ex. 1, Complaint, ¶¶ 6-7). However, service upon the Attorney General

is not sufficient service upon state employees or officers who are sued in their ***individual***

***capacities***. Burgos v. Department of Children & Families, et. al. 83 F. Supp. 2d 313, 316

(D. Conn. 2000).

In the present case, defendants Newton and Appleton executed affidavits stating

***that they were not served personally and no one was authorized to except service of***

***process for them in their individual capacities.*** (Facts, ¶¶ 5, 7). What the state marshal

did was show up at the Attorney General's offices to deliver the complaints to effectuate

service upon the State of Connecticut and the defendants in their "official" capacities.

However, leaving the complaints with the CHRO office did NOT effectuate service upon

the individual defendants who have been also been sued in their individual capacities. In

their Amended Answer to the complaint, the defendants raised the issue of a lack of

personal jurisdiction upon defendants Appleton and Newton pursuant to Rule 12(b)(4)

and 12(b)(5). (Ex. 46, Defendant's Amended Answer, p. 10).

This same situation occurred in the case of Bishop v. State of Connecticut, et al,

Case No.3:01CV1140(AVC) (D. Conn.). In Bishop, the individual defendants were not

served personally. The summons were left with an agency official who had no authority

to accept service for the defendants in their personal capacities. The defendants raised

the issue of personal jurisdiction in their answer to the complaint and then moved for

–8–

summary judgment.  In granting the defendant's motion, Judge Covello correctly observed that a challenge to personal jurisdiction is not waived if raised in the operative answer. See Rule 12 (b). Also, once raised, the burden is upon the plaintiff to prove that personal service was properly perfected.

In sum, the lack of service of process upon defendants Newton and Appleton requires that the case against them in their individual capacities be dismissed.

**B.    THE PLAINTIFF'S §§ 1983 AND 1981 CLAIMS AGAINST DEFENDANTS WATTS ELDER, NEWTON, AND APPLETON IN THEIR OFFICIAL CAPACITIES ARE BARRED BY THE ELEVENTH AMENDMENT AS A SUIT AGAINST THE STATE.**

The plaintiff has sued defendant Watts Elder in her official capacity only, and defendants Newton and Appleton in both their official and individual capacities. (Complaint, Exhibit 1, ¶'s 6-8).  Any claim against these defendants in their official capacities must be dismissed because the state is not a "person" within the meaning of section 1983 and the Eleventh Amendment bars such claims.

Section 1983 only authorizes the imposition of liability against a "person" who acting under color of state law violates another person's federally protected rights.  The Supreme Court in Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct 2304, 105 L.Ed.2d 45 (1989), has made clear that neither State agencies or State officials acting in their official capacities are "persons" under section 1983.  Thus, to the extent that the defendant has been sued in his official capacity for damages and retrospective relief under section 1983, state officials acting in their official capacities are not "persons" subject to section 1983 liability. Gaby v. Board of Trustees of Community Technical

–9–

Colleges,  348 F.3d 62 (2nd Cir. 2003).

Furthermore, the Eleventh Amendment to the United States Constitution bars the State of Connecticut from being sued under 42 U.S.C. § 1983.  The Eleventh Amendment provides "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const., Amend. XI.  The well accepted rule of law is that 42 U.S.C. § 1983 does not abrogate the Eleventh Amendment immunity of states, including suits against state agencies.

The established law is that the Eleventh Amendment also bars an action for damages against Newton, Watts Elder and Appleton in their official capacity.

> "The Eleventh Amendment bars a suit against state officials when the 'state is the real, substantial party in interest.'"  Pennhurst State School & Hospital v. Halderman, supra, ___ U.S. at ___, 104 S.Ct at 908, quoting Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).  Thus a suit which seeks a money judgment "which must be paid from the state treasury is barred by the Eleventh Amendment," even though it is nominally asserted against an individual official.  Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974).  Since plaintiff seeks money damages from the individual defendants "in their official capacity" for acts performed within the scope of their respective offices, recovery, if any, will be from the state treasury; thus the bar of the eleventh amendment applies.

 Daisernia v. State of New York, 582 F.Supp. 792, 799 (N.D.N.Y. 1984).  The Eleventh Amendment clearly bars the plaintiff's request for compensatory damages, punitive damages, attorney fees and costs against the defendants in their official capacities because such a claim is essentially a suit against the state, acting through the three

–10–

defendants in their official capacities.

The same analysis applies to the plaintiff's section 1981 claim against these defendants in their official capacities. According to numerous courts in the Second Circuit, the Eleventh Amendment bar of suits against the state applies to section 1981 claims. Yoonessi v. State Univ. of New York, 56 F.3d 10 (2d Cir. 1995); Reed v. State of Connecticut Department of Transportation, 2000 U.S. Dist. Lexis 6271 (D.Conn. 2000); Chada v. Connecticut Medical Examining Board, 1999 U.S. Dist. Lexis 18939 (D.Conn. 1999); Daisernia v. State of New York Department of Corrections, 582 F.Supp. 792, 799, 803 (N.D.N.Y. 1984) (Section 1981 does not abrogate the sovereign immunity of the states).

Since a claim premised upon § 1981 against defendants Watts Elder, Newton and Appleton in their official capacities is a suit against the state, the Eleventh Amendment bars such actions. Accordingly, Counts 2 and 4 of the complaint making reference to Sections 1983 and 1981 are barred and must be dismissed.

## C. THE PLAINTIFF CANNOT PROVE A PRIMA FACIE CASE ESTABLISHING A VIOLATION OF THE EQUAL PROTECTION CLAUSE.

Although the defendants submit that the claims against defendants Newton and Appleton must be dismissed for lack of personal service, should the court find otherwise, these defendants will address why the plaintiff's equal protection claim fails.

The plaintiff's equal protection claim appearing in Count 2 of the complaint is somewhat amorphous because it does not clearly identify the facts upon which this claim

is premised. A careful reading of the complaint includes many superfluous facts, opinions and speculation on the plaintiff's part.  However, the basic contention by the plaintiff is that she was treated differently than others because of her race, color, religion and national origin.

There is no dispute that the plaintiff was terminated in 2001 by former Executive Director Watts-Elder (black female) for misconduct, the particular circumstances of which are discussed in another section of this memorandum.  But other than her termination, the plaintiff cannot point to any _legally recognized_ adverse action that she claims resulted from the conduct of defendants Newton and Appleton.[1]  At best, the plaintiff testified to a litany of things she disliked and her perception that she was watched more closely than other employees.  She points out two warnings and criticisms about her conduct by former CHRO Deputy Director Jewel Brown (a black male) in 1997 and 1998. (Facts, ¶¶ 99, 100, 101).  Unfortunately, Mr. Brown is not a party to this lawsuit and Ms. Watts Elder has only been sued in her _official capacity_. (Ex. 1, Complaint, ¶ 6).  Even so, these alleged actions, even if they could form the basis of an equal protection claim, are_ not imputable_ to defendants Appleton and Newton as individual defendants.

The defendants submit that the plaintiff cannot show a violation of her equal protection rights.  The essence of one's right to equal protection "is that persons similarly

---

1    Within the context of a § 1983 action, once under color of state law is established, an equal protection claim parallels a Title VII claim for disparate treatment. Feingold v. State of New York, et al., 366 F.3d 138, 159 (2d Cir. 2003). It is axiomatic that for there to be such a claim some type of adverse action beyond the plaintiff's personal suspicions and speculation is required. Plaintiff's feeling that she was disliked or carefully scrutinized is  not enough.

situated with respect to challenged government action shall be treated similarly." <u>Smith v. U.S. Parole Com'n,</u> 814 F.Supp. 246, 247 (D.Conn. 1993). Employees are similarly situated if there is an "objectively identifiable basis for comparability' … a reasonable close resemblance of the facts and circumstances." <u>Ramos v. Marriott International, Inc.,</u> 134 F. Supp. 2d 328, (S.D.N.Y. 2001); quoting <u>Graham v. Long Island Rail Road</u>, 230 F.3d 34, 40 (2d Cir. 2000). This does not mean that all people must be treated identically. Rather to prevail on his equal protection claim, the "plaintiff must show that he (she) was treated differently because of his ethnicity, national origin race, or his membership in another suspect class." <u>See</u> <u>Saulpaugh v. Monroe Community Hospital</u>, 4 F.3d 134, 143-44 (2d Cir. 1993); <u>Carrero v. New York City Housing Authority</u>, 890 F. 2d 569, 577 (2d Cir. 1989). The requirement of discriminatory intent or purpose "…implies that the decision maker, … selected or reaffirmed a particular course of action at least in part 'because,' not merely 'in spite of' its adverse effects … upon a member of a protected group." <u>Personnel Administrator of Massachusetts v. Feeney</u>, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

The applicable case law makes clear that the plaintiff's equal protection claim is without merit. First, plaintiff cannot prove that she is similarly situated to a white non-Muslim CHRO manager who submitted inaccurate time records and was NOT disciplined. The only person who the plaintiff compares herself to is the former CHRO

counsel, Phillip Murphy, who the plaintiff claims habitually arrived late to work.
Unfortunately, when asked at her deposition if she had any evidence to support a claim
that Murphy had falsified his time sheets as a basis for this comparison, she stated no she
did not.  It was just rumor according to her testimony.   (Facts ¶ 122).

Plaintiff's only complaint against defendant Appleton is that she delayed in
getting the plaintiff's computer hooked up, that Appleton would question her about
business matters, and that Appleton and expressed a dislike for her. (Facts ¶ 105).  Even
if such conduct did occur, the plaintiff cannot point to any ADVERSE action taken by
defendant Appleton towards Assegai that amounts to a constitutional violation.  (Facts ¶
115).  It is noteworthy that other than to request a printout of the card access reports for
the Rowland Government Building from the Fusco Management Company, defendant
Appleton had NO involvement in the plaintiff's termination. (Facts 63-64).

The same is true of defendant Newton, who the plaintiff contends influenced
former Deputy Director Brown to criticize her and with the help of friends in the
Waterbury office, would spy on her. (Facts, ¶¶ 103, 104, 107). Of course, there is no
evidence to support such speculation on Assegai's part, and even if her suspicions were
true,  again that would not constitute an equal protection violation because Newton also
never took adverse action against her. (Facts ¶ 104).  When asked directly, the plaintiff
admits that Newton never did anything to her directly and that other than her termination

proceedings, she was never formally disciplined for any conduct. (Facts ¶ 115). The termination decision was not made by Newton, it was made by Watts Elder. (Facts ¶ 92).

Second, plaintiff cannot prove discriminatory intent on the part of the defendants. The decision of Watts Elder cannot be imputed to Donald Newton or Leanne Appleton. Defense counsel has found no legal decisions holding a subordinate personally liable for the decisions of a supervisor under §§ 1983 or 1981. Newton reviewed the access card records regarding the plaintiff time sheets, but did not himself conduct the time audit of the plaintiff time sheets. That was done by a different CHRO employee, Donna Dixon, to whom the plaintiff has not attributed any improper motive. (Facts ¶¶ 67-69).

Several additional facts highlight the absurdity of the plaintiff's suggestion that Newton was racially and culturally biased toward her. In January 2000, when the plaintiff missed a scheduled meeting and did not call into the office as required, Newton accepted the plaintiff's explanation that she was ill, that her phone was not working, and that there was no one to call in for her. In that instance, she had marked her time sheets properly by taking sick time. (Facts ¶¶ 50-52). On July 17, 2000 (only a few months before the investigation of her time records), Newton gave the plaintiff a satisfactory job performance evaluation indicting that the plaintiff was meeting all job expectations. (Facts ¶ 54). Then there is the February 13, 2001 email from Newton to Assegai requesting that she change her time sheet to reflect her tardiness on January 26, 2001,

–15–

evidencing Newton's belief that there had simply been an error. It wasn't until Assegai's acerbic response to Newton's email that the issue of her truthfulness even arose. (Facts ¶¶ 61-62). Lastly, the plaintiff's replacement in Waterbury is a black female of Jamaican decent. (Facts ¶ 123). This evidence refutes any equal protection claim.

In the end, the plaintiff is simply attempting to bootstrap her dismissal for dishonest conduct into a constitutional issue against the WRONG defendants. The overwhelming evidence is that Bogle-Assegai habitually abused her position as a Regional Manager by coming in late and leaving early. She was unaware of the detailed card access information produced by the computer system in the Rowland Building (Facts ¶¶ 38, 40) until she got caught lying on her time sheets. Suddenly she decided she had to scramble to explain hours of stolen time. To do this she concocted explanations about parking on the street and about her husband dropping her off at work, none of which is substantiated by the calendar entries she claims to have made, (but which were never provided to the Executive Director). (Facts ¶¶ 79-88). Her admission that she repeatedly stopped off at the credit union in Hartford on state time to conduct personal business is itself a legitimate reason for her dismissal. (Facts ¶ 72). The only other CHRO person who had a garage space, a disabled person, had no problem getting into the garage and to work on time. (Facts ¶ 85). Last, there is the testimony of the very person whom the plaintiff entrusted to run the office when she was not there, Joanne Steinagle.

Steinagle testified that Bogle-Assegai seldom arrived at work before 10:00 a.m. and routinely left before 5:00 p.m., though her scheduled hours were from 8-5. (Facts ¶¶ 16-17).   There simply is no evidence that defendants Newton or Appleton intentionally violated the plaintiff's constitutional rights because of her race, religion, color or national origin.

Although not articulated as such, the plaintiff may attempt to couch her equal protection claim as  "class of one"  by asserting that no other Regional Manager had his or her  time sheet scrutinized. That is true for two very good reasons. First, no other regional manager asserted that they were working when Mr. Newton called the regional office and was told that the manager had not yet arrived to work. Second, at that time no other regional office, other than in Waterbury, was equipped with a card access system like the one in the Rowland Building.   What the plaintiff cannot show is that other regional managers submitted false time sheets, that Watt-Elder or Newton <u>knew about it</u>, and failed to act.

However, to prevail on this approach the plaintiff must still establish the following:  (1) that she, as compared with others similarly situated, was selectively treated; and (2) such selective treatment was based on impermissible considerations such as … intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  <u>Presnick v. Town of Orange</u>, 152 F. Supp. 2d 215

(D.Conn. 2001); citing <u>Crowley v. Courville</u>, 76 F.3d 47, 52-53 (2d Cir. 1996). Confusion has arisen recently over the requirement to show malice in a "class of one" equal protection claim based on the Supreme Court's ruling in <u>Village of Willowbrook v. Olech</u>, 528 U. S. 562, 120 S.Ct. 1073 (2000) which noted that "our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and there was no rational basis for the difference in treatment. <u>Willowbrook</u>, 120 S.Ct. at 1074.

The issue of motive need not even be addressed in this case because plaintiff cannot show that she was similarly situated to other managers who engaged in similar conduct and were not disciplined. To arguably prevail on such a claim, the plaintiff would have to show that defendant Newton was aware of a similarly situated employee to the plaintiff's situation and took no action to report the matter. There simply is no such evidence to support such a claim.

Even if the issue of motive is addressed, the facts show the absence of intentional discrimination in the defendants' conduct related to the time card issue. Again, it was only Cynthia Watts Elder who made the decision to terminate the plaintiff. (Facts, ¶ 92). There simply are no facts showing any arbitrary or irrational action on the part of defendants Newton and Appleton.

**D.    DEFENDANTS NEWTON AND APPLETON ARE ENTITLED TO QUALIFIED IMMUNITY.**

If the Court finds that the plaintiff's §§ 1983 and/or 1981 claims are insufficient to satisfy a prima facie case, the qualified immunity issue need not be reached.  However, even if the Court were to find that plaintiff's §1983 and § 1981 equal protection claims are sufficient to withstand summary judgment, then defendants Donald Newton and Leanne Appleton are entitled to the protection of qualified immunity and summary judgment must enter in their favor.

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 2829 (1985); Giacolone v. Abrams, 850 F.2d 79, 84 (2d Cir. 1988).  "The entitlement is an immunity from suit rather than a mere defense to liability . . ."  Id.  The principal purpose of the doctrine is to enable public officials to do their jobs without fear of subsequently facing liability for actions they could not reasonably have believed violated the law at the time, Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982), and to avoid disruption to effective government counsel by the burdens of litigation.  Mitchell v. Forsyth, 105 S. Ct. at 2809. The test is one of objective reasonableness, and is determined by establishing whether a reasonable official in the defendant's position could have believed that his actions were lawful, in light of clearly established law.  Anderson v. Creighton, 483 U.S. 635,107 S.

Ct. 3034, 3039 (1987).

The test is a stringent one and requires that there be a very close factual fit between the case under consideration and previous case law establishing the illegality of the action or conduct at issue in order for the law to be characterized as "clearly established." Thus, in determining whether a particular right was clearly established, the Court must first identify the claimed right in a manner suited to the facts and circumstances of the particular case. Anderson, 107 S. Ct. at 3039; Soares v. State of Conn., 8 F.3d 917 (2d Cir. 1993). Then it must examine the case law of the Supreme Court and of the Circuit to determine whether, during the time period in question, the law was so clearly established that a reasonable official would understand that his actions were unlawful. Although the precise action in question need not have been held unlawful to defeat a claim of qualified immunity, the unlawfulness must be apparent under preexisting law. Anderson, 107 S. Ct. at 3039.

The Court must also decide whether it was clear at the time of the alleged violations of law that an exception did not permit the actions in question. Gittens v. LeFeure, 891 F.2d 38, 42 (2d Cir. 1989). Finally, and perhaps most importantly, even if the court concludes that the law was clearly established, the Court must determine whether it was objectively reasonable for the official to believe that his actions did not violate those rights. Oliveira v. Mayer, 23 F.3d 642, 648-49 (2d Cir. 1994). The

subjective motivation of the officials is irrelevant to the inquiry.  <u>Anderson</u>, 107 S. Ct. at 3040; <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 925 (2d Cir. 1991).  Rather, the focus is on whether reasonable officials in the position of the defendants could have believed their actions were lawful.  Where reasonable officials could disagree, the official is entitled to qualified immunity.  <u>Weg v. Macchiarola</u>, 995 F.2d 15, 18 (2d Cir. 1993).

The Second Circuit has held that where the underlying §1983 claim requires a showing of intent, as in a claim of unconstitutional retaliation, a government official's motive or intent in carrying out the questioned conduct should be considered in the qualified immunity analysis.  <u>Musso v. Hourigan</u>, 836 F.2d 736, 742 (2d Cir. 1988).

When the defense of qualified immunity is raised to a §1983 claim that is grounded in a state actor's unconstitutional motive as here, the federal district courts and Courts of Appeal have been placed in a quandary.  "The 'clearly established law' and 'objective reasonableness' facets of current qualified immunity doctrine tug in opposite directions where . . . the 'clearly established law' itself contains a subjective component."  <u>Blue v. Koren</u>, 72 F.3d at 1083. The Second Circuit recognizes that permitting consideration of motive could eviscerate the protection to which government officials are entitled by qualified immunity.  In response, these courts have required that a plaintiff present proof of the unconstitutional motive of each defendant, and have imposed on plaintiffs a "heightened standard," requiring plaintiffs to provide particularized evidence

of a direct or circumstantial nature that demonstrates the required state of mind in order to avoid summary judgment on the defense of qualified immunity.[2] Blue v. Koren, 72 F.3d at 1084. ("[T]he plaintiff must proffer particularized evidence of direct or circumstantial facts as suggested in Justice Kennedy's concurrence in Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 1795 (1991) supporting the claim of an improper motive in order to avoid summary judgment.")  Particularized evidence of improper motive includes expressions by the state officials regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken.  Blue, 72 F.3d at 1084.

While it may be clearly established that the plaintiff has a right under the Equal Protection Clause not to be treated adversely in public employment, it is equally clear

---

2    The "heightened standard" required by the Second Circuit is different from the "heightened standard" that the D.C. Circuit imposed on plaintiffs in Crawford-El v. Britton, 93 F.3d 813 (D.C. Cir. 1997), which the Supreme Court held was improper.  Crawford-El v. Britton, supra, 118 S.Ct. 1584 (1998).  In Crawford-El, the D.C. Circuit required a prisoner to adduce clear and convincing evidence of improper motive in order to defeat a motion for summary judgment on the ground of qualified immunity.  Thus, requiring the plaintiff to meet a heightened burden of proof.

The heightened standard "required by the Second Circuit requires the plaintiff to offer specific evidence of unconstitutional motive which "we [the Second Circuit] are doubtful that it imposes a burden greater than is already required under Fed. R. Civ. P. 56…[We] confess considerable doubt as to whether the heightened standard is really heightened or is simply an application of the rule that conclusory assertions are insufficient to defeat a motion for summary judgment."  Blue, supra, 1083-84.  The Second Circuit's approach was impliedly approved by the Supreme Court in Crawford-El, supra.

"[F]irm application of the Federal Rules of Civil Procedure is fully warranted and may lead to the prompt disposition of insubstantial claims."  Id. at 1596, quoting Harlow v. Fitzgerald, supra, 102 S.Ct. at 2739, fn. 35).

that Newton's and Appleton's conduct was objectively reasonable under the circumstances. The plaintiff has no credible evidence to suggest that under the circumstances described above, their decisions in connection with the investigation into the plaintiff's falsification of time cards and the theft of state time violated clearly established law. This is especially so in light of plaintiff's admission that the Executive Director had the power to request an investigation of the matter and the fact that Watts Elder made the actual decision to terminate the plaintiff. (Facts ¶¶ 92-93, 96). There is simply no evidence suggesting an "unconstitutional motive" on the part of defendants Newton or Appleton. Therefore, if the Court reaches the issue of qualified immunity, these defendants are entitled to summary judgment.

> **E.    THE PLAINTIFF'S TITLE VII CLAIM IS UNTIMELY UNDER 42 U.S.C. § 2000E-5(E).**

Plaintiff was formally notified on March 29, 2001 that she would be terminated from her position at the CHRO, yet she filed a charge of discrimination under Title VII <u>directly</u> with the EEOC on October 1, 2001, some 187 days after receiving formal notice of her termination. Under the holding in <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), the limitations period for filing a charge began to run from the date the Complainant was informed that she would be terminated, which in this case was March 29, 2001. <u>Miller v. International Telephone & Telegraph Corp.</u>, 755

F.2d 20, 24 (2d Cir. 1985); <u>Lenox v. Unisys Corp.</u>, 32 F. Supp.2d 44 (D. Conn. 1999).

The Complainant did not institute proceedings with a state or local agency (i.e. CHRO) with authority to grant relief in compliance with 42 S.C. § 2000e-5(e), nor did the EEOC defer the Complainant's charge to the state agency (the "FEP") in Connecticut for an investigation. Therefore, the appropriate limitations period is 180 days from March 29, 2001.  <u>See,</u> <u>Kocian v. Getty</u>, 707 F.2d 748, 751-752 (3d Cir. 1983); <u>Mayo v. Securities Industry Association</u>, 1995 U.S. Dist. LEXIS 15200 (S.D.N.Y. 1995).

Since there was no dual filing with both CHRO and EEOC (it was filed <u>only</u> with EEOC), the plaintiff is <u>not</u> entitled to 300 days and her Title VII claim is untimely and must be dismissed for this reason as well.  <u>National RR Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 S.Ct. 2061, 2070 (2002).

F.    **THE PLAINTIFF CANNOT PROVE A CASE OF RACE, COLOR, NATIONAL ORIGIN OR RELIGIOUS DISCRIMINATION UNDER TITLE VII AGAINST THE CHRO.**

In <u>McDonnell Douglas Corp. v. Green</u>,411 U.S. 792, 802 91973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof," that applies both to Title VII discriminatory-treatment cases based on race, color, religion, and national origin, <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993), and to cases alleging retaliation. <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308 (2d Cir. 1995).

According to the Supreme Court, the plaintiff in an employment discrimination case has the burden at the outset of "proving by a preponderance of the evidence a prima facie case of discrimination."  Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 251, 101 S. Ct. 1089, 67 L .Ed.2d 207 (1981); see also McDonnell Douglas, 411 U.S. at 802.  If the plaintiff succeeds in establishing a prima facie case (which she has not done in the present case), the burden of production shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its action.  McDonnell Douglas, 411 U.S. at 802.  "Any legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima face case."  Fisher v. Vassar College, 114 F.3d 1332, 1335-1336 (2d Cir. 1997).

### Count One (Alleging Title VII and CFEPA Violations Against The Defendant CHRO) Must Be Dismissed.

To defeat a motion for summary judgment on a claim of discriminatory treatment under Title VII based on race, color, religion and national origin, the plaintiff must prove:

> (1)  that she belongs to the protected class; (2) that she was performing her duties satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that the adverse action occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class.

McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997); Reeves v. Sanderson

Plumbing Prods., Inc.,, 530 U.S. 133, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000).

In the present case, there is no dispute that the plaintiff is a member of these protected classes, or that she was subjected to an adverse employment action (fired). However, plaintiff cannot possibly show that she was doing her job satisfactorily, <u>or</u> that she was fired under circumstances giving rise to an inference of discrimination.

The facts clearly show that the plaintiff was stealing state time, and that she failed to dispute (let alone refute) these charges against her.  (Facts ¶¶ 78, 81, 91).  Therefore, she was obviously not doing her job in a satisfactory manner.  Furthermore, the Courts have interpreted the fourth prong of the prima facie case test ("circumstances giving rise to an inference of discrimination") to apply when a plaintiff is replaced by someone who is not in her protected class.  <u>Byers v. Dallas Morning News</u>, 209 F.3d 419 (5th Cir. 2000).  In the present case, the plaintiff was replaced by someone who is a member of the same protected classes as she (Facts ¶ 123).  Therefore, the plaintiff has no evidence to support this fourth requirement either, and thus cannot establish a prima facie case.

If the plaintiff could make out a prima  facie case, the falsification of the time records is the legitimate non-discriminatory reason for Watts Elder's decision to fire plaintiff.  (Facts ¶¶ 92, 97).  At no time during the several Loudermill hearings did the plaintiff attempt to explain the discrepancies in her time sheets.

The defendants need not persuade the court that it was actually motivated by the proffered reasons in order to mollify the presumption and obligate the plaintiff to satisfy

the burden of proof." Fisher, 114 F.3d at 1335-36 quoting Burdine, 450 U.S. at 254, see also Meiri v. Dacon, 759 F.2d 989, 996 n. 11 (2d Cir. 1985). "If the defendant articulates a nondiscriminatory reason for its actions, 'the presumption raised by the prima face case is rebutted," Fisher, 114 F.3d at 1336, and "simply drops out of the picture." St. Mary's, 509 U.S. at 511. The plaintiff then has an opportunity to prove by a preponderance of the evidence that the employer's reason as "a pretext for discrimination." Burdine, 450 U.S. at 253; McDonnell-Douglas, 411 U.S. at 804.

Not only is the plaintiff unable to prove that the reason for her dismissal is false and/or a pretext for discrimination, during the course of this lawsuit she could do no better than to nit pick over a few of the hours the defendants claimed she was not at work (e.g. by claiming that she never took a lunch break, that her husband dropped her off occasionally, that she "piggybacked" into the office behind other employees who used their computer access cards, or that she had to make deposits at the credit union). (Facts ¶¶ 80-88). The problems with her excuses are that none of them were raised at the Loudermills, nor were they raised at any time before Watts Elder had to make the decision to fire her. (Facts ¶¶ 79, 81, 91). Furthermore, most of her excuses are not even legitimate (e.g. state time cannot be used to go to the credit union for personal banking business) and her excuses only involve a small percentage of the total hours that Watts Elder decided that she was in fact missing in action. (Facts ¶¶ 82-88). Plaintiff also

–27–

claims that Watts Elder was "out to get her" because she was a friend of Louis Martin. But this claim is belied by the fact that Watts Elder and Newton gave her a satisfactory evaluation only a few months before the theft of state time was discovered for which she was fired. (Facts ¶ 55). The fact remains that neither plaintiff's race, color, national origin, nor her religion immunizes her from termination for the theft of state time while she was employed in an important position of public trust.

### Plaintiff cannot establish a Prima Face Case of Retaliation.

In order to prevail in a Title VII retaliation claim the plaintiff must prove the following: (1) that she was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 292 (2d. Cir. 1998).3

"Upon such a showing, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." Van Zant v. KLM Royal

---

3        In count four  the plaintiff re-alleges her retaliation claim to include among her theories, §§ 1981 and 1983. However, the analysis is the same under section 1981 as that of Title VII. See, Yaba v. Roosevelt, 961 F. Supp. 611, 625 (S.D.N.Y. 1997).  Also, the courts do not recognize a cause of action for retaliation under the Equal protection Clause.  Bernheim v. Litt, 79 F.3d 318, 323-4 (2d Cir. 1996); Petrario v. Leslie Cutler, et al, 187 F. Supp. 2d 26, headnote 18 (D. Conn. 2002).

Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996); Grant v. Hazelett Strip-Casting Corp.,

880 F.2d 1564, 1569-71 (2d Cir. 1989).

      In order to survive summary judgment, the plaintiff must offer evidence

establishing a casual nexus between the protected activity and the adverse employment

action.  Such a burden can be established through direct evidence of  "retaliatory animus"

or indirectly with circumstantial evidence such as discriminatory or disparate treatment

following the protected act.  Daly v. Presbyterian Hospital, 2000 U.S. Dist. LEXIS 5

(S.D.N.Y. 2000).  In the present case, the plaintiff failed to produce any evidence that the

filing of her state court lawsuit caused her termination, or even that it had any effect upon

the disciplinary process, which it did not.

      On the issue of a retaliatory motive, the plaintiff in this case cannot prove that

such a motive played a role in her discharge as required under Title VII.  R.E.C.A.P. v.

Middletown, 294 F.3d 35, 54 (2d Cir. 2002).  The only possible protected activity which

plaintiff engaged in was the filing of one of her two injunction actions, the first of which

was filed in state court on March 9, 2001.  Since the defendant CHRO put the plaintiff on

notice of its investigation into her time records by letter dated March 1, 2001 and gave

her notice of the potential for discipline at that time, she cannot claim now that the cart

came before the horse.  (Facts ¶ 76).  The facts are clear that the process which ultimately

ended in her termination, began before any protected activity took place.  (Facts ¶¶ 76,

93).  In fact, by the time plaintiff filed her federal action for an injunction, she had

already been notified of her termination.  (Facts ¶ 120). The plaintiff admits that she

never filed a complaint of discrimination against the CHRO <u>during</u> her employment.

(Facts, ¶ 118).

    The filing of plaintiff's state court complaint did not insulate her from discipline

up to and including dismissal, for theft.  A discrimination complaint that is unreasonable

does not even qualify for protection under the participation clause of Title VII's

retaliation provision.  <u>See</u>, <u>Mattson v. Caterpillar</u>, 359 F.3d 885 (7th Cir. 2004); and

<u>Jackson v. St. Joseph State Hospital</u>, 840 F.2d 1387 (8th Cir. 1987) <u>cert. den</u>. 488 U.S.

892 (1988). Her state court lawsuit certainly was unreasonable, since it had no merit, no

injunction was ever issued, and it was soon withdrawn by plaintiff.  (Facts ¶ 81).  It was

nothing more than an attempt by plaintiff and her counsel to intimidate the defendants.

(Facts ¶ 79).

    Lastly, as with the plaintiff's Title VII disparate treatment race claim, she has

only two routes to prevent summary judgment:

> The plaintiff in a retaliation case should have two (and only two) distinct
> routes to obtaining/preventing summary judgment. One, the more
> straightforward, the one that is unrelated to <u>McDonnell Douglas</u>, is to
> present direct evidence . . . .
>
> The second route to summary judgment, the adaptation of <u>McDonnell
> Douglas</u> to the retaliation context, requires the plaintiff to show that after
> filing the charge only he, and not any similarly situated employee who did

not file a charge, was subjected to an adverse employment action <u>even though he was performing his job in a satisfactory manner</u>. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. (Emphasis added).

<u>Stone v. City of Indianapolis</u>, 281 F.3d 640, 644 (7th Cir.), <u>cert. den.</u> 123 S. Ct. 79

(2002). Again, she cannot establish that she was performing satisfactorily, so she cannot

make out a prima facie case. Even assuming <u>arguendo</u> that she could somehow make out

a prima facie case, the defendants have certainly produced evidence to show their

legitimate, non-discriminatory reasons for firing her, namely theft of state time.

The courts have held that under these circumstances, the plaintiff must show that

these reasons are pretextual, which she cannot do. <u>Holt v. KMI Continental , Inc.</u>, 95 F.3d

123, 131 (2d Cir. 1996).

> **Plaintiff's state law claims in Count One against CHRO under Conn. Gen. Stat. § 46a-58 and § 46a-60 are barred by the Eleventh Amendment.**

Connecticut's waiver of state sovereign immunity through its state statutes (Conn.

Gen. Stat. § 46a-58, 46a-60), Conn. Gen. Stat. § 46a-94a, Conn. Gen. Stat. § 46a-99,

Conn. Gen. Stat. 46a-100, and Conn. Gen. Stat. § 46a-101) does <u>not</u> amount to a waiver

of the state's 11th Amendment immunity in federal court. <u>See</u> <u>e.g.</u>, <u>Page v. CT Dept. of</u>

<u>Public Safety</u>, 185 F. Supp. 2d 149, 159 (D. Conn. 2002) and <u>Alungbe v. Bd. of Trustees</u>,

283 F. Supp. 2d 674, 687-88 (D. Conn. 2003). The federal courts have specifically held

that claims (such as plaintiff's) under Conn. Gen. Stat. § 46a-58 (see Plaintiff's

Complaint, p. 1, ¶ 1) cannot be brought in federal court, Garcia v. St. Mary's Hospital, 46

F. Supp. 2d 140, 142 (D. Conn. 1999), and neither can plaintiff's claims under Conn.

Gen. Stat. § 46a-60.  See, Lyon v. Jones, 168 F. Supp. 2d 1, 6 (D. Conn. 2001) and

Alungbe v. Bd. of Trustees, 283 F. Supp. 2d at 687-688.

> **Plaintiff's Title VII Claim Against The CHRO is Barred Because The Plaintiff Has Not Obtained A Right To Sue Letter From The Department of Justice as Required by 42 U.S.C. § 2000e-5(f)(1).**

The plain language of 42 U.S.C. § 2000e-5(f)(1) clearly requires the plaintiff to

obtain a right to sue letter from the U.S. Attorney General in the present case, because

this case involves a "governmental agency", namely CHRO.  Conn. Gen. Stat. § 46a-52.

It is undisputed that the plaintiff has not obtained such a letter from the Attorney General,

nor has she even tried to obtain one.  (Facts ¶¶ 121).  Initially, the federal courts held that

this is a strict jurisdictional requirement, which mandates dismissal whenever it is not

met.  Ferrell v. Ass'n of Central Oklahoma Courts, 481 F.Supp. 125 (1978); Osiecki v.

Hsg. And Redev. Authority, 481 F.Supp. 1229 (1979).  More recently, some courts have

granted equitable modification of the statute if the plaintiff tried but failed to obtain a

right to sue letter from the Attorney General.  Fouche, supra, at 1526.  See also, Solomon

v. Hardison, 746 F.2d 699 (11th Cir. 1984).  In Ward v. Florida Dept. of Juv. Justice, 194

F.Supp.2d 1250, (N.D. Fla. 2002), the Court held that the statutory requirement could be

waived <u>only</u> because the plaintiff <u>had</u> <u>requested</u> the U.S. Attorney General to issue the letter.

In cases in which the plaintiff has obtained a right to sue letter from EEOC, but has never even requested one from the Attorney General (such as the present case) the courts have dismissed the plaintiff's case. <u>Thames v. Okl. Historical Society</u>, 646 F.Supp. 13, 16 (W.D. Okl. 1985), <u>aff'd</u> 809 F.2d 699 (10th Cir. 1985). Therefore, since it is undisputed that the plaintiff never even requested a right to sue letter from the Attorney General, and since she is, and always has been, represented by counsel, her Title VII claims should be dismissed for failure to comply with the plain language of 42 U.S.C. § 2000e-5(f)(1).

**G.    THE PLAINTIFF CANNOT PROVE A PRIMA FACIE CASE FOR A RACIALLY HOSTILE WORK ENVIRONMENT.**

The plaintiff no doubt has convinced herself that everyone at the CHRO who did not share her personal views was biased towards her. It is through such a distorted prism that the plaintiff views events. Two of the alleged perpetrators of an alleged racially hostile work environment, Jewel Brown and Cynthia Watts-Elder, are black. While this fact alone creates no legal presumption, it does lend some insight into the speculative reach of the plaintiff's claim.[4]

---

[4]    Throughout this section the defendant will simply refer to a " hostile work environment" or "harassment"  to include all of the bases for the plaintiff's claim: race, color, religion, and national origin.

As a threshold issue, the plaintiff's hostile work environment claim is barred for failure to exhaustive her administrative remedies. The plaintiff filed her complaint directly with the EEOC hundred and eighty seven (187) days after she was notified of her termination. (Facts ¶ 121). So assuming that the last act of "harassment" was her termination (which is a questionable assumption), her claim is barred because the holding in National Railroad Passenger Corp. v. Abner Morgan, 536 U.S. 101, 122 S.Ct 2061, 153 L.Ed.2d 106 (2002), requires that an act contributing to the claim must occur within the filing period. Since the plaintiff in the present case bypassed the state deferral agency, her filing period was 180 days. Therefore, the plaintiff can point to no "act contributing to the claim" that falls within the statutory filing period. Her hostile work environment claim is barred.

Even if the plaintiff's claim for a hostile work environment is not time barred, she cannot prove a prima facie case for several reasons: (1) her work environment was not permeated with racial or ethnic ridicule sufficient to alter the conditions of her work, and (2) there is no basis for imputing liability to the defendant CHRO. Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002); Oliver v. University of Connecticut Health Center, 292 F. Supp. 2d 398 (D. Conn. 2003).

### Hostile work environment

While there is no fixed number of incidents that a person must endure in order to establish a hostile work environment, the court must view the circumstances in totality, examining the nature, severity and frequency of the conduct . <u>Harris v. Forklift Sys., Inc</u>., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).  Relevant factors include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. <u>Cruz v. Coach Stores, Inc</u>., 202 F.3d 560, 570 (2d Cir. 2000).  A plaintiff must also prove that the work place was *so severely permeated* with discriminatory intimidation, ridicule, and insult  that the terms and conditions of her employment were altered. <u>Leibovitz v. N.Y. City Transit Auth.</u>, 252 F.3d 179, 188 (2d Cir. 2001);  <u>Oliver v. University of Connecticut Health Center</u>, 292 F. Supp. 2d 398, 409 (D. Conn. 2003). The test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive the environment to be abusive. As a general rule the incidents must be more than episodic, they must be sufficiently continuous and concerted in order to be deemed pervasive. <u>Perry v. Ethan Allen, Inc</u>., 115 F.3d 143, 149 (2d Cir. 1997); <u>Diggs v. Town of Manchester</u>, 303 F. Supp. 2d 163 (D. Conn. 2004).

The requirement that an environment be permeated with racial ridicule to a level that it ACTUALLY alters a plaintiff's work situation cannot be understated. This law was designed to root out those instances in which a person is truly immersed in a racially abusive situation. It was intended for use as an offensive weapon against employers to challenge business decisions that have no connection to race simply because the employer happens to be in a protected class. For this reason, the district courts in Connecticut have rejected cases in which actual racial epithets, jokes, and comment were directed at a plaintiff because they were too isolated and sporadic to constitute a collectively hostile environment.

For instance, Diggs v. Town of Manchester, 303 F. Supp. 2d 163 (D. Conn. 2004, the plaintiff, a fireman, was terminated for misconduct. In response, he brought an action in 2002 claiming that he was subjected to a racially hostile work environment. The plaintiff's evidence of a racially hostile work environment consisted of an incident in 1988 when someone made a reference to "niggers", a complaint of discrimination he had filed in 1989, an incident in 1994 when a white firefighter accused the plaintiff of being a racist, a second altercation with another firefighter about an alleged racial comment and a generally hostile environment. The district court on a motion for summary judgment ruled that such evidence was insufficient to support a hostile environment claim. Id. at 181-82. See also, Martin v. Town of Westport, 2004 U.S. Dist. LEXIS 15340 (D.

–36–

Conn.)(one racial remark to plaintiff and one disciplinary incident not sufficient).

### No basis for imputing liability

In a Title VII case premised on a theory of a hostile work environment, the plaintiff must establish a specific basis for imputing liability to the employer.  Karibian v. Columbia University, 14 F.3d 773, 779 (2d Cir.), cert denied, 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994). Although an employer is presumed responsible when the perpetrator of harassment is the victim's supervisor, if the harassment did not result in a "tangible employment action", an employer may avoid liability if:  (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid the harm otherwise. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.ed2d 633 (1998); Faragher v. City of Boca Raton, 524 U.S. 775, 807-808, 118 S.Ct. 2275, 141 L.Ed2d 662 (1998).

For conduct by a co-worker, the employer will only be liable if the  plaintiff proves that "the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it."  Mackey v. Unity Health System, 2004 U.S. Dist. LEXIS 8830  (W.D.N.Y. 2004)(citing Feingold v. New  York, 2004 U.S. App. LEXIS 8543, 2004 WL 916629,  * 10 (2nd Cir. 2004)).

In <u>Mormol v. Costco Foods</u>, 364 F.3d 54, 58 (2nd Cir 2004), this court discussed the meaning of the phrase "tangible employment action" for the purpose of the affirmative defense established in <u>Ellerth</u>. In <u>Mormol</u>, this court correctly noted that Ellerth requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  364 F.3d at 57. While there is no requirement that the action result in direct economic harm, there must be a materially adverse act amounting to more than minimal job disruption or unpleasantness.

In the present case not only has the plaintiff been unable to prove any conduct amounting to racial harassment, she suffered no tangible job loss through the conduct of Brown, Newton,  Appleton or Watts-Elder,  prior to her dismissal in 2001. The is no dispute that the plaintiff's termination was tangible job loss, but that standing alone as an  isolated incident cannot form the basis of a hostile work environment claim. At best the plaintiff's case merely rests on the sporadic racial comments that she was told were made by co-workers at some time during her 9 years at CHRO.

It is undisputed that the CHRO has a stated written procedure for the reporting of any complaints of discrimination and harassment. (Facts, ¶ 116). It is also the case that during her employment that plaintiff never filed a complaint of discrimination against her employer utilizing the internal procedure stated in the policy. (Facts, ¶ 118).  Therefore,

having failed to complain about any conduct by Brown,  Newton or Appleton until

AFTER she was dismissed from the CHRO for misconduct, there can be no basis for

imputing liability to the employer in this case.

### J.     COUNT FIVE IS BARRED BY THE 11TH AMENDMENT.

In Count Five of her complaint, the plaintiff has also raised a claim pursuant to

Conn. Gen. Stat. § 46a-99, which provides as follows:

> Sec. 46a-99.  (Formerly Sec. 4-611).  Discriminatory state practice:
> Cause of action; relief.  Any person claiming to be aggrieved by a
> violation of any provision of sections 46a-70 to 46a-78, inclusive, or
> sections 46a-81h to 46a-81o, inclusive, may petition the Superior Court
> for appropriate relief and said court shall have the power to grant such
> relief, by injunction or otherwise, as it deems just and suitable. (emphasis
> in bold added).

Here again, however, the Connecticut legislature only authorized suit in the Connecticut

Superior Court and not in the federal court.  There has never been a waiver of Eleventh

Amendment immunity through Conn. Gen. Stat. § 46a-99 or through any other

Connecticut civil rights statute.  It is for this reason that the U.S. District Courts in

Connecticut have dismissed such state civil rights claims:

> The state has clearly waived immunity to claims brought under CFEPA as
> to cases brought in the Connecticut state courts.  Conn. Gen. Stat. § 46a-
> 99.  However, this court has found that there is nothing in the Connecticut
> General Statutes that constitutes an express waiver of Eleventh
> Amendment immunity for CFEPA claims.  *Garris*, 2001 WL 359495 at
> *4; *Walker v. Conn.*, 106 F. Supp.2d 364, 370 (D. Conn. 2000).
> Therefore, the court grants the defendants' motion to dismiss as to the
> CFEPA claims brought against the Attorney General on the grounds that

–39–

they are barred by Eleventh Amendment Immunity.

Lyons v. Jones, 168 F. Supp.2d 6 (D. Conn. 2001).  Thus, this claim in Count

Five is clearly barred by the Eleventh Amendment.

     Finally, it should be noted that since the plaintiff's federal claims cannot

survive summary judgment (see arguments, infra), this court should not retain

jurisdiction over any of her state law claims either.  See 28 U.S.C. § 1367(a) and

(c)(3).  United Mine Workers v. Gibbs, 282 U.S. 715, 726 (1966); Occhino v.

Lonnon, 150 F.R.PD. 613, 617 (D. Minn. 1993).

                         DEFENDANTS,
                         STATE OF CONNECTICUT,
                         COMMISSION ON HUMAN RIGHTS
                         AND OPPORTUNITIES; CYNTHIA
                         WATTS-ELDER; LEANNE APPLETON
                         and DONALD NEWTON

                         RICHARD BLUMENTHAL
                         ATTORNEY GENERAL

              By:   _____
                         David M. Teed
                         Assistant Attorney General
                         Federal Bar # ct09102
                         55 Elm Street, P.O. Box 120
                         Hartford, CT 06141-0120
                         Tel: (860) 808-5210
                         Fax: (860) 808-5385
                         E-mail: David.Teed@po.state.ct.us

By:     _____

Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail: Joseph.Jordano@po.state.ct.us

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 16th day of September, 2004 a copy

of the aforementioned Defendant's Memorandum in Support of Their Motion for

Summary Judgment was sent by First Class United States mail, postage prepaid to:

Eroll V. Skyers, Esq.
Barrister Law Group
211 State Street, 2nd Floor
Bridgeport, CT 06604

_____

Joseph A. Jordano
Assistant Attorney General

–41–