**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FEMI BOGLE-ASSEGAI, | : | CIVIL ACTION NO. |
| *Plaintiff,* | : | 3:02CV2292(HBF) |
| | : | |
| V. | : | |
| | : | |
| STATE OF CONNECTICUT, | : | |
| COMMISSION ON HUMAN RIGHTS | : | |
| AND OPPORTUNITIES; and | : | |
| CYNTHIA WATTS ELDER, | : | |
| in her official capacity as Executive | : | |
| Director, Connecticut Commission on | : | |
| Human Rights and Opportunities, | : | |
| ("CHRO") and LEANNE APPLETON, | : | |
| in her individual capacity and official | : | |
| capacity as Director of Finance of | : | |
| CHRO; and DONALD NEWTON, | : | |
| in his individual capacity and official | : | |
| capacity as CHRO Chief of Field | : | |
| Operations, | : | |
| *Defendants* | : | SEPTEMBER 16, 2004 |

**DEFENDANTS' RULE 56(a)1 STATEMENT OF FACTS**

BACKGROUND

1.    Plaintiff is a resident of the State of Connecticut. (Exhibit 1, ¶ 14).

2.    The plaintiff was hired by CHRO Executive Directive Louis Martin (Black male) on January 3, 1992 in a provisional position as an Investigator in the Regional Office of CHRO located at 1229 Albany Avenue, Hartford, CT.  (Exhibits 2; Exhibit 75, Excerpts from Deposition of Femi Bogle-Assegai, Vol. I, dated January 20, 2004, hereinafter "Bogle-Assegai Depo., Vol. I", p. 77:1-1; 79:19-23).

3.      Defendant Cynthia Watts-Elder served as the Executive Director of the CHRO from March 1999 until August 2003.  (Exhibit 46, ¶ 19; Exhibit 42, Affidavit of Donald Newton, dated June 27, 2002, ¶ 4).

4.      Defendant Leanne Appleton served as the Fiscal Administrative Supervisor (Business Manager) for the CHRO from January 27, 1994 until 2004. (Exhibits, 46, ¶ 7; Exhibit 80, Excerpts from Deposition of Leanne Appleton, dated June 9, 2004, hereinafter "Appleton Depo.", p. 3:15-4:12).

5.      Defendant Appleton was not personally served with process in this case and at no time did she authorize anyone to accept personal service of process on her behalf. (Exhibit 81, Affidavit of Leanne Appleton, ¶ 2).

6.      Defendant Donald Newton as been employed by the CHRO for over 30 years and since fall 1999, has been serving as the Chief of Field Operations. (Exhibit 42, Newton Aff., ¶ 2; Exhibit 50).

7.      Defendant Newton was never personally served with process in this case and at no time did he authorize anyone to accept personal service of process on his behalf. (Exhibit 42, Newton Aff., ¶ 1).

8.       She was given a permanent Investigator position effective August 1, 1993. (Exhibit 3; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 79:24-80:6).

9.       Only a little over two years later on October 13, 1995, the plaintiff was promoted by Martin to become Regional Manager for the Bridgeport Office of CHRO. (Exhibit 75, Bogle-Assegai Depo., Vol. I, p. 80:7-12).

10.     Plaintiff's promotion was exceptionally quick by CHRO standards, because most investigators average ten years of service before becoming a Regional

Manager.    (Exhibit 42, Newton Aff., ¶ 6; Exhibit 79, Excerpts from deposition of

Donald Newton, dated June 28, 2004 [hereinafter "Newton Depo."], p. 108:8-18).

11.    In 1997, the plaintiff accepted a lateral transfer to become Regional

Manager for the CHRO office in Waterbury, which was then located at 52 Linden Street

in a building with no security system. (Exhibit 1, ¶ 13).

12.    At that time in 1997, the plaintiff was supervised by Deputy Director

Jewel Brown (a black male), and sometimes by the other Deputy Director, her close

friend Valeria Caldwell Gaines.  (Black female). (Exhibit 42, Newton Aff., ¶ 7).

13.    As a CHRO Regional Manager, she was responsible for overseeing the

entire office operation, including the supervision of staff. (Ex. 75, Bogle-Assegai Depo.,

Vol. I, p. 20:12-25; Ex. 79, p. 115:1-23).

14    The plaintiff was expected  to be in her office from 8 a.m. to 5 p.m. She

never requested a change to her assigned work schedule. She had no permission to come

into work late when she so desired. (Exhibit  14; Ex. 75, Bogle-Assegai Depo., Vol. I, pp.

22:1-10; 36:16-37:5; Ex. 79, Newton Depo., p. 125:18-24).

15.    The plaintiff claims that she kept tabs on the Waterbury staff by personal

observation only. (Exhibit 75, Bogle-Assegai Depo., Vol. I, p. 24:1-13).

16.    When the plaintiff was out of the office she left CHRO employee Joanne

Steinnagel in charge, who she considered to be very honest. (Ex. 75, Bogle-Assegai

Depo., Vol. I, p. 23:2-7; Ex. 76, Excerpts from Deposition of Bogle-Assegai, dated June

7, 2004 [hereinafter "Bogle-Assegai Depo., Vol. II."], p. 249:1-250:2).

17.    According to Steinnagel, the plaintiff  "would habitually arrive at the

office about 10:00 a.m. . . . Femi routinely left the office by 5:00 p.m. since that was

when her subordinates left" and she often asked co-workers for a ride home.   (Exhibit 34, p. 2).

18.    The CHRO did not have a flextime policy.  The plaintiff was expected to be there from 8:00 a.m. to 5:00 p.m. (Exhibit 75, Bogle-Assegai Depo., Vol. I, p. 25:8-12, ; 31:9-12; 36:12-19; Exhibit 76, Excerpts from Deposition of Femi Bogle-Assegai, dated June 7, 2004, [hereinafter Bogle-Assegai Depo., Vol. II, p. 324:3-8; Ex. 79, Newton Depo., p. 43:13-44:2; Exhibit 80, Excerpts from Deposition of Leanne Appleton, dated June 9, 2004, [hereinafter "Appleton Depo."] p. 41:8-10).

19.    When the plaintiff asked for clarification about the CHRO compensation time policy and was told that  request for "comp" time had to be pre-approved in writing. (Exhibits 13; Exhibit 39, Ex. 75, Bogle-Assegai Depo., Vol. I, pp. 147:3-148:17; Exhibit 79, Excerpts from Deposition of Donald Newton, dated June 28, 2004 [hereinafter "Newton Depo.], p. 133:19-134:11).

20.    If a regional manger was going to be late for work, he/she was expected to call in to Donald Newton, the Chief of Field of Operations. (Ex. 42, Newton Aff., ¶ 14; Ex. 79, Newton Depo., p. 140:14-20).

21.    A regional manager could not set their own schedule on a day to day basis. (Ex. 80, Appleton Depo., 41:20-42:3; Ex. 79, Newton Depo., pp. 113:23-114:13).

22.    In March, 1999, the defendant Cynthia Watts Elder was appointed as Interim Executive Director of CHRO, and in July, 1999 when she was given a four year term in that position pursuant to C.G.S. §46a-52(c). (Ex. 42, Newton Aff., ¶ 4).

23.     On September 9, 1999, the CHRO Commissioners discharged the two Deputies (Brown and Caldwell Gaines) who served in non-civil service positions at the

pleasure of the Executive Director. Both deputy director positions were eliminated and never refilled.  (Exhibit 42, Newton Aff., ¶ 8).

24.     Sometime after the deputy Director positions were eliminated, Watts Elder changed defendant Donald Newton's title to that of  Chief of Field Operations (CFO) (to supervise the four regional managers including the plaintiff).  (Exhibit 78, Excerpt from Deposition of Cynthia Watts Elder, dated June 9, 2004 [hereinafter "Watts Elder Depo.], p. 14:2-22).

25.     None of the organizational changes  that occurred on September 1999 had any effect upon plaintiff, who continued to serve as Regional Manager in Waterbury. (Exhibit 42, Newton Aff., ¶ 8).

TERMINATION FOR MISCONDUCT

26.     In the late summer of 2000, the CHRO Waterbury office moved into the newly built Rowland Government Center on West Main street in downtown Waterbury. (Exhibit 42, Newton Aff., ¶ 13).

27.     None of the defendants Donald Newton, Cynthia Watt Elder or Leanne Appleton had any involvement in the design of the Rowland Center or the card access computer system. (Exhibit 42, Newton Aff., ¶ 13; Ex. 79, Newton Depo., p. 121:9-16).

28.     The Rowland Center is managed by the Fusco Management Group. (Exhibit 45, Affidavit of Helen "Penny" McCorison, dated March 11, 2004 [hereinafter "McCorison Aff'], ¶ 2).

29.     The Rowland Building was built to include an electronic card access system tied to a computer system. The system was not that of the CHRO, but was part of

the building and was used throughout the building. (Exhibits 45, McCorrison Aff., ¶ 4; Ex. 78, Watts Elder Depo., p. 26:13-17).

30.     To enter the building through the garage or another entrance and move between offices in the building, employees in the Rowland Center had to use their swipe access cards.  (Exhibits, 45, McCorison Aff., ¶¶ 3-6 & 9; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 30:10-18).

31.     The card access system was installed and operational when the Rowland center opened in August  2000. To the plaintiff's knowledge if the system was up an working, it was accurate.  (Exhibits 45, McCorison Aff., ¶¶ 3, 10; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 34:20-36:2; Ex. 76, Bogle-Assegai Depo., Vol. II,  p. 251:6-16).

32.     The plaintiff as the manager of the CHRO regional office, was one of only two people who had access to a space in the parking garage under the Rowland Building. Exhibit 75, Bogle-Assegai Depo., Vol. I, p. 13;7-20; 14:5-7).

33.     In order to gain access to the underground garage space, the plaintiff had to enter from the rear of the building through a common entrance owned by the adjoining bank, proceed down the ramp to the entrance into the Rowland Building garage. (Exhibit 45, McCorison Aff., ¶ 4-7; Ex. 75, Bogle-Assegai Depo., Vol. I, pp. 14:8-15:3).

34.     Within the Rowland Building, there is a card access swipe panel at the main entrance to the building, in the elevators, the entrance to the CHRO suite, the entrance to the staff areas, and again to enter the private CHRO offices.  Even going to the lounge on the CHRO floor requires an access card.  CHRO employees had keys to their personal offices within the CHRO suite only.  (Exhibit 45, McCorison Aff., ¶¶ 11-12; Ex. 75, Bogle-Assegai Depo., Vol. I, pp. 225:5-227:13).

35.    The entrance to the Rowland building garage has a mechanical arm at the entrance and exit lane of the garage that require use of the employee's access card. (Exhibit 45, McCorison Aff., ¶¶ 6-8; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 17:1-17).

36.    The Rowland Building card access system records entrances into the Rowland Building garage with the code "2-1 in gate" and exits from the building as "2-1 out gate."  (Exhibits 17; Ex. 45, McCorison Aff., ¶ 9).

37.    There is only one entrance and exit into and out of the garage. (Exhibits 17; Ex. 45, McCorison Aff., ¶ 5, 14).

38.    The computer system within the Rowland building records each time an access card used, noting the time, location, and person who card was swiped.  The card access system was for security purposes.  A "by product" was that the system could provide  information about employee presence within the building. (Exhibit 45, McCorison Aff., ¶ 9;  Ex. 78, Watts Elder Depo., p. 33:5-13; Ex. 42, Newton Aff., ¶ 13).

39.    Donald Newton meet with the regional managers on a regular basis to discuss CHRO issues, including the importance of accurate of time cards. (Exhibit 79, Newton Depo., p. 111:15-112:15; Ex. 42, Newton Aff., ¶ 14).

40.    The card access system was not a time card system and the CHRO officials, including the defendants, did not have regular access to those records. (Exhibit 42, Newton Aff., ¶ 18).

41..    On May 9, 2000,  Donald Newton sent a memo concerning work schedules  to all four Regional Managers (including plaintiff) that stated in pertinent part:

> "The following times represent the work schedules that you previously indicated were your normal working hours: Epi, Capitol Region: 8 a.m. – 5 p.m.; Tanya, Southwest: 8:30 a.m. – 5 p.m. [1/2 hour lunch]; Femi, West Central:

> 8 a.m. – 5 p.m.; Jim, Eastern: 8 a.m. – 5 p.m.  Please confirm
> by fax or e-mail if these times are correct."

(Exhibit 14, p. 1).

42.    The plaintiff confirmed by e-mail to Newton dated May 11, 2000 at 2:26 p.m. that "My hours of work has [sic] not changed…".  (Exhibit 14, p. 2).

43.    Donald Newton continually reminded all the Regional Managers (including plaintiff) of the CHRO policy concerning the fact that they were expected to be at work on time every day (in accordance with their approved schedules) in order to set an example for their staff, and that if they wanted any time off, they needed his permission in advance.  (Exhibit 42, Newton Aff., ¶ 14; Ex. 79, Newton Depo., pp. 111:15-112:12, Exhibit 53).

44.    The plaintiff understood the attendance policy. On several occasions she sent memoranda to Newton during the period from his appointment as CFO until the day she was fired requesting time off or informing him of her tardiness. (Ex. 14, p. 2)

45.    Since Newton had worked directly for Jewel Brown from 1995-1999, he was aware that Brown had experienced problems with the plaintiff pertaining to poor attendance and tardiness, and that Brown had written memos on the subject.  (Exhibit 7; Ex. 42, Newton Aff., ¶ 10; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 97:16-98:18).

46.    Newton was also aware that even though the State had generous benefits concerning earned sick time (12 days/yr.), vacation time (15 days/yr.) and personal time (3 days/yr.), the plaintiff took so much time off that she never accumulated any significant accrued sick or vacation time. (Ex. 42, Newton Aff., ¶ 10; Exhibit 49).

47.    Donald Newton's office was in Hartford so he had no means of regularly monitoring plaintiff's time and attendance (or that of other Regional Managers) on most

8

days, unless he happened to call the regional office or have a meeting at a regional office. He would call the regional offices several times a month. (Exhibit 79, Newton Depo., p. 18:8-21).

48.     While Newton was responsible for signing the time and attendance cards filled out every two weeks by the Regional Managers, he signed them based on the managers representation that they were truthful unless he had a particular reason to call them into question.  (Ex. 79, Newton Depo., p. 17:11-16).

49.     There was a level of trust regarding the submission of time sheets. If a person worked less than 8 hours, they were expected to take sick, vacation or personal time. (Exhibit 78, Watts Elder Depo., pp. 18:17-22, 19:4-13).

50.     On January 3, 2000, Newton arrived for his regularly scheduled monthly meeting in Waterbury with plaintiff and the Waterbury staff (about a dozen investigators and support staff), but plaintiff never appeared, so he had to hold the meeting without her. (Exhibit 44; Ex. 42, Newton Aff.,  ¶ 19).

51.      Newton memorialized  this incident via a memo to the plaintiff (with a copy to Watts Elder) dated 1/11/00, which stated as follows:

> "The meeting with you and your staff was scheduled to start
> at 9:30 a.m.  I began the meeting without you at 9:45 on,
> since you had not yet arrived and your staff had not heard
> from you.  When I left the region at 11:45 a.m. we still had
> not heard from you."

(Exhibit 44)

52.     The plaintiff responded by memo dated 1/12/00 in pertinent part as follows:  "Donald, this is to share with you the fact that my telephone at home was out of order on the morning of January 3, 2000 and an immediate family member was not available first thing in the morning to inform the region in a timely manner."  Since the

plaintiff was willing to use sick time (and subsequently did so on the time card she later submitted to Newton for the two week period which included that day), Newton signed the time card and did not pursue this matter further. (Exhibits 44; Ex. 79, Newton Depo., p. 32:3-15).

53.     This incident did alert Newton to the possibility that time, attendance, and tardiness might become an issue between him and plaintiff, just as he knew it was between Jewel Brown and plaintiff. (Ex. 42, Newton Aff., ¶ 19).

54.     In July 2000, Donald Newton and Cynthia Watt-Elder gave the plaintiff an annual job evaluation reporting that she was meeting expectations in all of the job areas. There was no mention of attendance problems because Newton assumed that the plaintiff was coming to work on time and truthfully reporting her work time. (Exhibit 43).

55.     Plaintiff acknowledges that her performance ratings for 1999 and 2000 were both satisfactory. (Exhibit 76, Bogle-Assegai Vol. II, pp. 252:16-253:1).

56.     The CHRO had no flex-time policy that permitted regional mangers to simply make up a work schedule. They were not permitted to come in late for work one day and then make the time up the next day, or work odd hours such as 12 noon to 8 p.m. (Exhibit 79, Newton Depo., pp. 113:23-114:4).

57.     CHRO regional managers were not permitted to make up their schedules as they saw fit. (Exhibit 79, Newton Depo., p. 114:5-13).

58.     On the morning of Friday, January 26, 2001, Newton called plaintiff in Waterbury sometime between 10 a.m. and 10:30 a.m., and staff informed him that the plaintiff had not arrived to work.  (Exhibit 79, Newton Depo., p. 6:1-23, 7:7-23).

59.     When Newton received plaintiff's two week time sheet for the period of January 26 – February 8, 2001,  he noticed that plaintiff had recorded 8 hours worked, representing that she had been  at work all day.  (by noting "8 R").  (Exhibit 18, p. 6; Ex. 79, Newton Depo., p. 21:8-22:6).

60.     On  February 13, 2001, Newton sent an email message to the plaintiff informing her that he could not approve her time sheet as presented and asking her what type of paid leave (sick, vacation, personal) leave she wanted to use for the hours she missed for being late on January 26, 2001 and February 1, 2001. (Exhibit 63).

61.     The plaintiff responded on February 14, 2001, and stated that she had arrived at work at 9:30 a.m. (not 8:00 as required) and insisted that she was in the office when he called. (Exhibits 64; Ex. 79, Newton Depo., p. 117:5-118:9, 119:1-23).

62.     Faced with an obvious discrepancy between the staff member's comment that the plaintiff was not at work by 10:00 when he called and Bogle-Assegai's insistence that she had arrived at 9:30 a.m. (not 8 a.m. as required), Newton asked Leanne Appleton to request the access card records from the Fusco Company in the hope that it might explain what happened. (Exhibit 79, Newton Depo., p. 27:22-30:1, 119:11-23).

63.      Newton asked the CHRO Business Manager, Leanne Appleton, to request the card access records for the CHRO Rowland Center staff from the Fusco Management Company, which she did. (Ex. 80, Appleton Depo., pp. 15:21-16:12; Ex. 79, Newton Depo., pp. 119:24-120:10).

64.     The Fusco Management Company supplied the access records for all of the CHRO employees dating back to November 2000. Other then requesting the records, Defendant Leanne Appleton had no involvement in the case.  (Ex. 45, McCorison Aff., ¶

10; Ex. 80, Appleton Depo., p. 16:3-18; 19:25-20:9; Ex. 79, Newton Depo., p. 120:11-24).

65.    The access card records were provided to Watts Elder and Donald Newton. Upon review of the records for January 26, 2001, it showed that the plaintiff arrived at the garage at 10:30 a.m. through gate 2-1 of the garage. (Exhibit 17, p. 18).

66.    The access card reports also revealed numerous occasions when the plaintiff arrived several hours late for work, occasions when she left work before the end of the day and sometimes both. (Exhibits 17;  Ex.18; Ex. 79, Newton Depo., p. 27:22-30:1).

67.    After review of the records from Fusco, Cynthia Watts Elder then requested that an investigation be conducted and that CHRO employee Donna Dixon conduct an audit of all the CHRO employee time cards, including the plaintiff's by comparing time sheets against the computer access card records. (Exhibit 78, Watts Elder Depo., p. 21:7-25, 25:23-26:3).

68.    CHRO employee Donna Dickson compared the employee time sheets with the access cards. Because  the plaintiff was one of only two people who had access to the garage, and an employee had to use his/her access card to both enter and exit the garage, it was much easier to detail the plaintiff's activity. (Exhibit 18)

69.    Donna Dickson's audit of the plaintiff's time revealed numerous hours of work time claimed by the plaintiff that was contradicted by the card access records. (Exhibit 18).

70.    Because the plaintiff reported that she did not routinely take a lunch, even though she admits that a half hour is required, Donna Dickson went back and credited the

plaintiff with an hour of work time for each day, as well as various work meetings that plaintiff claimed to have attended outside the office.  (Exhibit 73, Exhibit 79, Newton Depo., p. 125:25-126:18).

71.     A revised audit showed many hours of time (almost $2000 dollars) stolen from the state, in addition to the falsified time records submitted by the plaintiff. (Exhibit 18).

72.     Plaintiff admits that she would often stop at the credit union in Hartford on personal, not state, business before coming to work, which resulted in not getting to work until 9:30 or 10:00 a.m. (Exhibit 75, Bogle Assegai Depo., Vol. I, p. 49:2-17; Ex. 77, Bogle Assegai Depo., Vol. III, p. 487:3-25).

73.     The plaintiff admits that CHRO employees came in late to work. (Exhibit 75, Bogle-Assegai Depo., Vol. I, pp. 59:25-60:7, 66:9-15).

74.     If  CHRO employees in her office wanted to work through lunch, they would get approval, but she never requested permission from Newton to work through her lunch hour. (Exhibit 75, Bogle-Assegai Depo., Vol. I, pp. 62:4-17).

75.     The plaintiff claims she does not know why, and has no evidence as to why an investigation into her time records was undertaken. (Exhibit 76, Bogle-Assegai Depo., Vol. II, pp. 251:24-252:21, 253:11-254:7).

ADMINISTRATIVE PROCEEDINGS

76.     On  March 1, 2001, Cynthia Watts Elder informed the plaintiff by written letter that an investigation of her time records was conducted and that based on that investigation, the agency was considering formal discipline, including dismissal.  The

plaintiff was given formal notice that a Loudermill hearing was scheduled for March 6, 2001. (Exhibit 66).

77.     The March 6  hearing was cancelled due to inclement weather. It was rescheduled for  March 12, 2001. (Exhibit 67).

78.     Before the Loudermill hearing, the plaintiff filed an injunction proceeding in both state and federal court but no injunction was ever issued. (Exhibit 82, Endorsement 3-2, dated April 10, 2001; Exhibit 83, Exhibits 40 and 41).

79.     On March 12, 2001, the plaintiff appeared at the Loudermill hearing along with her attorney.  The plaintiff refused to participate in the Loudermill hearing or answer any questions. Instead, she asked for and was given until Wednesday, March 18, 2001 to file a written response.  During the March 12, 2001 hearing, the plaintiff was provided with a copy of her time sheets, the audit report for the period 11/13/00-2/22/01, and the Fusco Management Card Access Report. (Exhibits 17; 18; 68; Ex. 75, Bogle-Assegai Depo., Vol. I, p 32:23-33:5, Ex. 76, Bogle-Assegai Depo., Vol. II., pp. 218:5-14, 219:6-11; Ex. 79, Newton Depo., pp. 122:10-123:23).

80.     After the March 12, 2001 Loudermill hearing the plaintiff allegedly constructed monthly calendars for the period November 2000 through February 2001 explaining the time discrepancies, she never produced any such information until this lawsuit was well underway. (Exhibits, 16, pp. 5,10, 14, 15 and 20; Ex. 75, Bogle-Assegai Depo., Vol. I., pp. 44:17-46:25; Ex. 76, Bogle-Assegai Depo., Vol. II., p. 217:12-22; Ex. 79, Newton Depo., pp. 122:10-124:5).

81.     Although the plaintiff now claims that at the time of the two Loudermill hearings she had information which she claims could have explained or refuted some of

the discrepancies, the plaintiff never provided to the CHRO Executive Director or any of the defendants any written documentation or explanation  for the discrepancies between her time sheet and Access Card records showing her arriving late to work, leaving early and otherwise cheating on her time records.  (Exhibit 75, Bogle-Assegai Depo., Vol. I, pp. 44:17-46:25; 219:18-220:3; Ex. 78, Watts Elder Depo., p. 49:4-9).

82.    The records the plaintiff produced on March 3, 2004 in discovery are the only one she has ever produced relating to her time card discrepancies. (Exhibit  75, Bogle-Assegai Depo., Vol. I, p. 221:19-222:1).

83.     The plaintiff testified that she maintained a daily calendar showing those days when her husband allegedly dropped her off for work attempting to explain why she was not in the garage or when she claims to have parked on the street due to traffic congestion, but she did not produce such records in discovery and now admits that she has no longer has any records that support this claim. (Exhibit 75, Bogle-Assegai Depo., Vol. I,  pp. 38:12-41:5, 44:17-46:25; Ex. 77, Bogle-Assegai Depo., Vol. III, pp. 379:12-382:11, 502-503; Ex. 78, Watts Elder Depo., p. 49:10-12).

84.    Plaintiff has no records showing when she allegedly parked on the street outside the Rowland building due to traffic congestion and never complained to the Director about getting access to the garage.  (Exhibit 76, Bogle-Assegai Depo., Vol. II, p. 237:2-17; Ex. 78, Watts Elder Depo., p. 50:1-4).

85.    The only other CHRO employee with access to the garage, a disabled employee, had no problem accessing the garage on the dates the plaintiff says she could not because of congestion. (Ex. 76, Bogle-Assegai Depo., Vol. II., p. 324:9-326:10).

86.    There are numerous unexplained inconsistencies between the plaintiff's recollection of when she arrived to work and the access cards. For instance, on January 26, 2000, the plaintiff's calendar states that she arrived at 9:30 a.m. and left at 7:30 p.m. The card access report shows her arriving in the garage through the gate at 10:30 a.m. and existing at 6:30 p.m. (Exhibits 16, p. 5; Ex. 17, p. 18).

87.    Similarly, on November 22, 2000, the plaintiff reports on her calendar that she never provided to or informed the CHRO that she had allegedly worked from 7:00 a.m. to 5:00 p.m. But again, the access cards report shows that she actually entered the garage gate at 9:47 a.m. and exited the garage at 1:59 p.m. (Exhibit 16, p. 15; Ex. 17, page 3).

88.    Despite the plaintiff's testimony that she would try to get into work before 7:30 a.m., the card access records show that between November 13, 2000 and February 22, 2001, the plaintiff only arrived to work 2 times before 8:30 a.m., 11 times before 9:00 a.m., 19 times between 9 and 10 a.m. and 15 times after 10:00 a.m., including the days when she apparently drove herself to work.  (Exhibits 17; 18; Ex. 75, Bogle-Assegai Depo., Vol. I., p. 22:1-10).

89.    Instead of responding directly to the disputes concerned her time sheets, on March 14, 2001 plaintiff's counsel sent a letter to Cynthia Watts Elder, making all kinds of unrelated accusations attacking the investigation without a single document to support the plaintiff's claims. (Exhibit 69; Ex. 78, Watts Elder Depo., p. 49:1-12).

90.    On  March 23, 2001, Cynthia Watts Elder sent a second letter to the plaintiff, this time informing her that the audit of other CHRO Waterbury staff revealed that another CHRO employee under her supervision had submitted time records she had

approved showed inaccuracies. (Exhibit 71). A second Loudermill hearing was scheduled

for March 26, 2001. (Exhibit 65)

91.    On March 26, 2001 the plaintiff, along with her attorney, again met with

Donald Newton to discuss the previous charges and most recent charges concerning

CHRO employees.  Plaintiff's counsel again offered no information in response to the

allegations that staff member time sheets were inaccurate. Instead, plaintiff attempted to

put political pressure on Watts Elder through the Connecticut Caucus of Black Women

and the CHRO Commissioners.  (Ex. 42, Newton Aff., ¶¶ 26-27, Exhibit 64; Exhibit 73)

92.    Defendant Watts Elder considered a range of discipline, but determined

that because of the importance of a Regional Manger as a role model, and in view of

serious charges, anything less than termination would send the wrong message. (Exhibit

78, Watts Elder Depo., p. 29:2-9).

93.    On March 29, 2001, Cynthia Watts Elder informed the plaintiff that her

employment was terminated effective April 12, 2001. (Exhibits 70, Ex. 75, Bogle-

Assegai Depo., Vol. I., p. 74:1-8).

94.    On three occasions during this litigation, the defendants requested the

production of diaries, calendars and other document that the plaintiff claims substantiate

her contention that she was at work, which she gave to her former attorney. None of these

diaries and calendars were ever produced. (Exhibit 75, Bogle-Assegai Depo., Vol. I., pp.

38:12-41:5, 44:17-46:25; Ex. 76, Bogle-Assegai Depo., Vol. II., p. 242:19-243:13,

244:18-245:2; Ex. 77, Bogle-Assegai Depo., Vol. III, pp. 379:12-382:11, 502-503).

95.    Plaintiff is not aware of any evidence that other employees falsified their

time sheets. (Ex. 77, Bogle-Assegai Depo., Vol. III, p. 397:5-10, 408:22-409:3; 413:3-7).

96.    Plaintiff admits that it was within the powers of the Executive Director to conduct an investigation into the irregularities regarding time records. (Ex. 77, Bogle-Assegai Depo., Vol. III, pp. 416:12-417:3).

97.    Plaintiff was terminated for falsifying her time records and the theft of state time. (Ex. 70; Ex. 79, Newton Depo., p. 27:7-13).

RACIALLY HOSTILE ENVIRONMENT

98.    While employed by the CHRO as a Regional Manager from 1995 until September 1999, the plaintiff was supervised by Deputy Director Jewel Brown. (Ex. 42, Newton Aff., ¶ 7)

99.    Plaintiff claims that she was harassed and discriminated against by Mr. Brown between 1995-1999. The adverse action she complains about were warnings and criticisms of her work in memos and phone calls. (Ex. 76, Bogle-Assegai Depo., Vol. II., pp. 271:23-275:3; Ex. 77, Bogle-Assegai Depo., Vol. III., p. 444:22-445:5).

100.    All of the various memo that plaintiff produced about Brown's alleged harassment concerned the plaintiff's misuse of the state gas card, her tardiness, the accuracy of her time sheets, etc., and other work related matters. (Exhibits 7, 8, 23 and 55).

101.    Except for a couple of informal warnings in 1997 or 1998, the plaintiff was never actually disciplined by Mr. Brown in any manner. (Ex. 77, Bogle-Assegai Depo., Vol. III., p. 457:15-23).

102.    In 1999, Jewel Brown attempted to discipline, through written memos, a white female manager, defendant Appleton.  (Exhibits, 34; 35, 38;  Ex. 77, Bogle-Assegai Depo., Vol. III., pp. 491:14-492:25)

18

103.    Plaintiff claims that Newton harassed her by going to Brown and getting him to call her. (Ex. 77, Bogle-Assegai Depo., Vol. III., p. 449:1-20),

104.    According to the plaintiff, Donald Newton never took any direct action to harass her. (Ex. 77, Bogle-Assegai Depo., Vol. III, p. 449:23-450:6).

105.    Plaintiff's complains that she was harassed by Leanne Appleton in that she did not get her computer delivered in a timely manner and being questioned by her about business matters. (Ex. 76, Bogle-Assegai Depo., Vol. II, p. 294:17-295:24; Ex. 77, Bogle-Assegai Depo., Vol. III, p. 445:10-447:7, 450:25-452:4).

106.    The plaintiff was counseled about the timeliness of CHRO reconsiderations by Mr. Brown in 1996 and 1997, but was never disciplined.  (Exhibit 19, pp. 7-10; Ex. 76, Bogle-Assegai Depo., Vol. II, p. 299:18-300:18).

107.    Plaintiff claims that she was being spied on by staff at the direction of Donald Newton and Cynthia Watts Elder, but admits that she has no evidence of this fact. (Ex. 76, Bogle-Assegai Depo., Vol. II, p. 307:13-25).

108.    Appleton was never asked to spy on the plaintiff. (Ex.80, Appleton Depo., pp. 39:25-40:9).

109.    Plaintiff heard that during her nine years at the agency that some staff members in the regional office had at some time used racial remarks such a "nigger," but she never heard that terminology used towards her by any of the defendants.  (Ex.  75: Bogle-Assegai Depo., Vol. I, p. 150:19-151:16, p. 158:24-159:17; Ex. 76, Bogle-Assegai Depo., Vol. II, p. 329:3-18; Ex. 77, Bogle-Assegai Depo., Vol. III, p. 431:12-14).

110.    On January 26, 2001, a CHRO attorney wrote a memo to Cynthia Watts Elder, in which he asserted that Femi Bogle-Assegai had sent confidential legal papers to an attorney friend to help her sue the CHRO. (Exhibit 20).

111.    Facsimile records show a fax transmission from the CHRO Waterbury office on the date in question to Cynthia Jennings immediately after the same number of pages were faxed from the CHRO Central Office to the plaintiff. (Exhibits 20 and 21; Ex. 75, Bogle-Assegai Depo., Vol. I, p. 191:4-12; Ex. 77, Bogle-Assegai Depo., Vol. III, pp. 386:19-389:14).

112.    As a result of the January 26, 2001 memo, Watts Elder investigated that matter, which the plaintiff agrees was proper. (Ex. 77, Bogle-Assegai Depo., Vol. III, p. 389:15-390:2).

113.    Plaintiff speculates that one of the reasons for her dismissal was the January 26, 2001 memo, but that was never mentioned in the Loudermill notice of charges or during the various Loudermill hearings about her time records,  (Exhibits 60, 61, 65; Exhibit 77, Bogle-Assegai Depo., Vol. III, pp. 389:15-393:17).

114.    The plaintiff admits that she was terminated for the alleged falsification of records and the theft of state time. (Exhibit 70; Ex. 76, Bogle-Assegai Depo., Vol. II, pp. 359:24-360:7).

115.    Other than the hearings related to her termination in March 2001, the plaintiff was never subjected any type of disciplinary hearings. (Ex. 77, Bogle-Assegai Depo., Vol. III, p. 393:18-394:18).

116.    The CHRO has a stated policy prohibiting discrimination based on protected classes which also provides a procedure for reporting such complaints. (Exhibit 74)

117.    Defendant Watts-Elder never asked anyone to report to her about Bogle-Assegai's activities. (Ex. 78, Watts Elder Depo., p. 37:2-7, 38:8-11).

118.    At no time during her tenure did the plaintiff ever file any complaint of harassment by CHRO managers or supervisors. Plaintiff's EEOC charge filed on October 1, 2001, five months after her dismissal,  was the only charge of discrimination she ever filed against the CHRO as her employer. (Ex. 76, Bogle-Assegai Depo., Vol. II, p. 269:19-270:16, 270:23-271:5; Exhibit 84).

119.    On March 9, 2001, the plaintiff filed a state court action seeking an injunction barring the CHRO from terminating her. On April 6, 2001, the CHRO moved to dismiss the proceeding. No hearing was ever conducted on the request for a TRO. (Exhibits 40, 83).

120.    On April 9, 2001, some 10 ten days after the CHRO Executive Director had communicated her decision to terminate the plaintiff, Bogle-Assegai filed for a temporary injunction in federal court to prohibit the CHRO from dismissing her. The motion was denied as moot. (Exhibits 41, 69; 82).

121.    Plaintiff filed her charge of discrimination directly with the EEOC on October 1, 2001, some 187 days after receiving notice on March 29, 2001 that she was being terminated. (Exhibits 70 and 84).

122.    Plaintiff compares herself to a white male manager who she claims would come in late to work, but she has never seen his time cards and has no evidence of any

wrongdoing on his part. (Ex. 76, Bogle-Assegai Depo., Vol. II, pp. 358:21-260:6; Ex. 77,

Bogle-Assegai Depo., Vol. III., pp. 395:14-396:12).

     123.    The plaintiff's permanent replacement as Regional Manager of the

Waterbury office is a black female of Jamaican descent. (Exhibit 42, Newton Aff., ¶ 23).


            DEFENDANTS,

            RICHARD BLUMENTHAL
            ATTORNEY GENERAL


      BY:     _____
            Joseph A. Jordano
            Assistant Attorney General
            Federal Bar # ct21487
            55 Elm Street, P.O. Box 120
            Hartford, CT 06141-0120
            Tel: 860-808-5340
            Fax: 860-808-5383
            Email: Joseph.Jordano@po.state.ct.us

## **CERTIFICATION**

The undersigned hereby certifies that on the        day of September, 2004, a true

and accurate copy of the foregoing Defendants' 56(a)1 Statement of Facts was sent by

United State mail, postage prepaid, to the following:

Eroll V. Skyers, Esq.
The Barrister Law Group
211 State Street, 2nd Fl.
Bridgeport, CT 06604
Tel.: 203-334-4800

_____
 Joseph A. Jordano
Assistant Attorney General